UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MILTON JOHN NUSSBAUM, JR., | 4:22-CV-04039-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| KELLY S. MCKINNEY, | |
| Defendant. | |

Plaintiff, Milton John Nussbaum, Jr., moves for summary judgment on his claim against defendant, Kelly S. McKinney, and on McKinney's four counterclaims against himself. *See* Docket 12. McKinney opposes Nussbaum's motion in its entirety. *See* Docket 20.

## I.    **Factual Background**

Viewing the record in the light most favorable to McKinney, the record shows the following:

Nussbaum and McKinney met in 2013. Docket 19-2 at 6. Eventually, McKinney moved in with Nussbaum in Nussbaum's condo in September 2014, and Nussbaum paid for McKinney's living expenses. *See* Docket 16 ¶¶ 25-26 (recounting Nussbaum's payments of nearly $100,000 for rent and other living expenses while Nussbaum and McKinney lived together in Nussbaum's condominium starting in September 2014); Docket 21 ¶¶ 25-26 (disputing only the relevance of such assertions). Nussbaum owned, and still owns, three businesses. *See* Docket 19-4 at 6; Docket 19-4 at 6.

1

In October 2015, Nussbaum proposed to McKinney and simultaneously gave McKinney an engagement ring. *See* Docket 16 ¶ 1; Docket 21 ¶ 1. McKinney accepted the ring, intending to marry Nussbaum when he proposed. *See* Docket 16 ¶¶ 2-3; Docket 21 ¶¶ 2-3.

In December 2016, Nussbaum suffered a stroke and was hospitalized until February 2017. *See* Docket 16 ¶¶ 8-9; Docket 21 ¶¶ 8-9. After being released from the hospital, Nussbaum returned to live with McKinney at his condo. *See* Docket 19-1 at 9; Docket 19-2 at 9. For the next two to three months, McKinney helped Nussbaum bathe, helped him use the restroom, prepared meals for him, and drove him to therapy appointments. *See* Docket 16 ¶¶ 11-12; Docket 21 ¶¶ 11-12. The record contains no evidence that McKinney asked Nussbaum for compensation for her services at any point while she took care of him. Caring for Nussbaum caused McKinney to suffer increased pain due to having carpal tunnel syndrome. *See* Docket 19-1 at 15. At no point after Nussbaum's stroke did Nussbaum hire any in-home nurses to care for him. Docket 19-2 at 9.

McKinney testified that the reason she took care of Nussbaum was because, "I love him. It was just a natural thing that I would take care of this person." *See* Docket 19-1 at 9. She also exchanged text messages with Nussbaum in May 2021 about the time she spent caring for Nussbaum. *See* Docket 23-3 at 1-2. In these messages, McKinney repeatedly stated that she loved Nussbaum and that she had promised him that she would help him become independent. *Id.* Nussbaum responded by telling McKinney that he

2

never wanted a caretaker or nurse, and that he felt McKinney was more of a caretaker than a partner. *Id.*

In fall 2017, McKinney purchased a new home at Grand Prairie Estates in Sioux Falls, SD. *See* Docket 16 ¶ 13; Docket 21 ¶ 13. Nussbaum signed as a guarantor of the mortgage McKinney used to purchase the new home because McKinney could not obtain a mortgage on her own due to not having enough credit. Docket 16 ¶ 15; Docket 21 ¶ 15. McKinney testified that Nussbaum promised to pay her $4,000 a month for part of her mortgage payment before she purchased the Grand Prairie House. *See* Docket 19-1 at 15. Nussbaum also stated in the May 2021 text message exchange with McKinney that he agreed to pay $4,000 month. *See* Docket 19-3 at 6. Nussbaum testified that he told McKinney to "pay whatever bills you need paid out there[,]" and "I did not pay half of any rent . . . there were months were I paid all of it. There were months where I paid some of it." *See* Docket 19-2 at 12. Nussbaum further testified that "there [were] a lot of bills I paid, but not formally exact half the rent, no, never happened." *Id.*

While Nussbaum lived in McKinney's Grand Prairie home, McKinney served as an authorized signature holder of Nussbaum's personal checking account and Nussbaum authorized her to pay expenses out of his account. *See* Docket 16 ¶¶ 17, 19; Docket 21 ¶¶ 17, 19. While Nussbaum lived in McKinney's home, Nussbaum's contributions to McKinney totaled less than $4,000 a month. *See* Docket 16 ¶ 23; Docket 21 ¶ 23. McKinney testified that she asked Nussbaum why he did not pay her $4,000 per month, and that

3

Nussbaum responded by saying that he did not know why he did not have the money. *See* Docket 19-1 at 15. McKinney also explained that she could not pay herself from Nussbaum's account the full $4,000 every month because she "had to keep a certain amount of balance because [of] the bills that were due the next month." *See id.* Over the course of three years, McKinney only made partial mortgage payments out of Nussbaum's account on five different occasions for a total of $59,097.44. *See id.*; Docket 19-2 at 10, 12; Docket 14-2 at 1 (showing first check in January 2018), 8 (rent payment), 23 (mortgage payment), 68 (mortgage service check), 92-93 (April and May rent payment), 95 (showing last check in June 2021). Nussbaum lived in McKinney's house for 41 months, which at $4,000 per month would have totaled $164,000. *See* Docket 22 ¶ 31.

On January 21, 2019, and February 20, 2020, McKinney provided Nussbaum a $100,000 and $60,000 loan, respectively, for one of Nussbaum's businesses. *See* Docket 16 ¶¶ 37-38; Docket 21 ¶¶ 37-38. Nussbaum fully paid off both loans without interest roughly a year later. Docket 19-1 at 11. In her counterclaim, McKinney alleged that "[Nussbaum] agreed to reimburse [McKinney] with interest at an undisclosed rate." Docket 3 ¶ 18. In May 2021, close to a year and a half after McKinney provided the second loan to Nussbaum, Nussbaum told McKinney that "5% is a good rate[.]" *See* Docket 23-3 at 9. McKinney did not agree with this message. *Id.*

McKinney testified that at some point while Nussbaum lived with McKinney in the Grand Prairie House, Nussbaum "wanted to boost

[McKinney's] income so that [she] could maximize Social Security[.]" Docket 19-1 at 10. To achieve this goal, she and Nussbaum agreed that Nussbaum would pay her 25 percent of one of Nussbaum's business's proceeds. *See* Docket 19-1 at 9-10. McKinney could not remember which business the agreement revolved around. *See id.* at 10. She further testified that she and Nussbaum could have agreed to two businesses instead of just one business, but she "d[idn't] recall which ones[.]" *Id.* McKinney stated she was "not even sure why [Nussbaum appointed her as an officer] other than maybe that would have justified him paying me." *See id.* She testified that she did not remember a specific start date, end date, nor did she remember "anything specific" about the agreement concerning her becoming an officer. *See id.* at 10-11. Although Nussbaum added McKinney in one of his company's bylaws, McKinney "never completed any duties related to being an officer for one of the three businesses." *See id.* at 11; Docket 16 ¶ 35; Docket 21 ¶ 35.

In the Fall of 2020, McKinney took the ring off and "slammed it down on the end table and said there it is." Docket 19-2 at 14. Nussbaum kept the ring for two or three months and then gave it back to McKinney without proposing or discussing marriage. *See id.* McKinney and Nussbaum were still engaged at the time. *See id.*; Docket 19-3 at 2; Docket 19-4 at 4-5.[1]  In his deposition,

---

[1] In her opposition to Nussbaum's motion for summary judgment, McKinney strongly suggests that the engagement ended during an argument she had with Nussbaum in November 2020. *See* Docket 20 at 4-5, 7. But when asked to admit that she was engaged with Nussbaum until March 2021, McKinney denied it, stating that although she and Nussbaum were "having some issues and [she] was frustrated[,]" the two "did NOT BREAK UP[,]" and instead

Nussbaum testified that when he gave the ring back to her for the second time, he thought "maybe there's a chance we can do all this over again, start one more time. And I gave it back to her and asked her to wear it and she did." *See* Docket 19-2 at 14.

On May 10, 2021, Nussbaum and McKinney exchanged several text messages regarding the ring and the engagement. *See* Docket 23-3 at 2-5. Nussbaum never asked for the ring back during this text message exchange. *See generally id.* at 1-9. McKinney also testified in her deposition that after Nussbaum gave her the ring for a second time, Nussbaum never asked for her to return the ring. *See* Docket 19-1 at 15. Nussbaum testified in his deposition that he did ask for it back, and that after doing so, McKinney responded, "You'll never get it . . . I'm going to give it to my daughter." *See* Docket 19-2 at 13.  Nussbaum originally insured the ring but stopped insuring it once he "no longer had possession of it[.]" Docket 19-2 at 18.

---

"remained together and continued to sleep together until the day [she] left for Florida on June 25, 2021." *See* Docket 19-3 at 2. Federal Rule of Civil Procedure 36(a) governs party admissions, and "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." *Bender v. Xcel Energy, Inc.*, 507 F.3d 1161, 1168 (8th Cir. 2007) (citing Fed. R. Civ. P. 36(b))); *see also Praetorian Ins. Co v. Site Inspection, LLC*, 604 F.3d 509, 514 (8th Cir. 2010) (discussing effect of admissions and the appropriateness of using such admissions for purposes of summary judgment). Here, McKinney has not made a motion to withdraw or amend her admission, and thus the court finds that her admission that the engagement lasted until June 2021 binds her.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (alteration in original) (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995)). In reviewing the record, the court views the facts in the light most favorable to the non-moving party. *Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021). While "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient[,]" *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (quotations omitted), a party moving for summary judgment is not entitled to a judgment just because the facts he offers may appear to be more plausible or because the adversary may be unlikely to prevail at trial. *See Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997).

## III.    Discussion

Federal courts sitting in diversity apply the substantive law of the forum state. *See Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014). In doing so, federal courts must follow the decisions of the state's supreme court interpreting the forum's law. *See C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d

1142, 1145 (8th Cir. 2019). But if a state's supreme court "has not spoken on an issue, [federal courts] must predict how it would decide the issue[,]" and "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data." *Olmsted Med. Ctr. V. Cont'l Cas. Co.*, 65 F.4th 1005, 1008 (8th Cir. 2023) (quoting *Brill as Tr. For Brill v. Mid-Century Ins. Co.*, 965 F.3d 656, 659 (8th Cir. 2020)). Here, the court is sitting in diversity and thus South Dakota substantive law applies. *See* Docket 1.

### A. Return of Engagement Ring

Under South Dakota law, gifts are generally irrevocable. *See* SDCL § 43-36-3.[2] Although South Dakota does not have a statute that addresses gifts given in contemplation of marriage, the South Dakota Supreme Court has held that a gift-giver is entitled to keep a gift given in contemplation of marriage when such marriage did not occur. *See Fanning v. Iversen*, 535 N.W.2d 770, 773-75 (S.D. 1995). In *Fanning*, the Court dealt with a dispute between a man and woman who were engaged in which the woman claimed ownership of some property that the man had purchased (and conveyed co-ownership to the woman) while the two were engaged. *See id.* at 772. After the woman called off the engagement, the man filed a complaint requesting that the state trial court award him the title to the entire property. *See id.* The trial court granted the man's request, finding that based on the circumstances, the man conveyed the property to the woman "solely in contemplation of marriage." *See id.* at 772, 74.

---

[2] SDCL § 43-36-3 recognizes an exception to the rule—gifts given in view of death—but such an exception does not apply here.

After observing that "[t]he majority rule is that a gift made in contemplation of marriage is conditional and should be returned if that condition is not fulfilled[,]" the South Dakota Supreme Court applied such rule and held that the trial court did not err in finding the man gave the woman the property solely in contemplation of marriage, and thus correctly awarded the man sole title to the property given the two did not marry. *See id.* at 773-75.

*Fanning* instructs the court in two ways. First, *Fanning* makes clear that in South Dakota, a gift made in contemplation of marriage is conditional and should be returned if the marriage does not occur. *See id.* Second, although *Fanning* did not explicitly state so, the Court's analysis strongly suggests that determining whether the gift was made "in contemplation of marriage" is a fact specific inquiry. *See id.* at 774. For example, the Court cited the trial court's findings on the credibility of witnesses at trial, as well as various other facts that indicated the man conveyed the property "solely in contemplation of marriage." *See id.*

Finally, this court observes that although the South Dakota Supreme Court has not explicitly stated as such, courts across the country uniformly recognize that engagement rings are presumptively given in contemplation of marriage. *See, e.g., Campbell v. Robinson*, 726 S.E.2d 221, 225 (S.C. Ct. App. 2012); *Heiman v. Parrish*, 942 P.2d 631, 634 (Kan. 1997) (concluding that "[i]n the absence of a contrary expression of intent, it is logical that engagement rings should be considered, by their very nature, conditional gifts given in contemplation of marriage" and collecting cases finding the same). The very

9

nature—and name—of an engagement ring justifies this presumption. Thus, the court similarly predicts that the South Dakota Supreme Court would conclude that individuals who give engagement rings presumably give them on the condition of marriage. This presumption, however, can be rebutted based on contrary evidence of the gift-giver's intent.[3] *See, e.g.*, *Campbell*, 726 S.E.2d at 225-26; *Billittier v. Clark*, 992 N.Y.S.2d 157, at *3 (N.Y. Sup. Ct. 2014). If disputed, determining a gift-giver's intentions is a question of fact for the jury. *See Setliff v. Akins*, 616 N.W.2d 878, 888 (S.D. 2000).

The South Dakota Supreme Court has similarly not directly addressed what role fault should play in deciding which party is legally entitled to the ring. *See generally, Fanning*, 535 N.W.2d 770 (not addressing the issue). The majority rule is to follow a no-fault approach, such that a gift giver's fault or lack thereof is irrelevant in determining to whom the ring belongs. *See* Arielle L. Murphy, *Whose Fault is it Anyway?: Analyzing the Role "Fault" Plays in the Division of Premarital Property if Marriage Does Not Ensue*, 64 Cath. U. L. Rev.

---

[3] The South Dakota Supreme Court has not addressed the evidentiary burden one must meet to rebut the presumption that an engagement ring was given in contemplation of marriage. At least one court in New York required the defendants to present "clear and convincing evidence" to rebut the "strong presumption that the ring was given solely in contemplation of marriage[.]" *See Billittier v. Clark*, 992 N.Y.S.2d 157, at *3 (N.Y. Sup. Ct. 2014). At the summary judgment stage, the court need not identify the precise standard that the jury should use in making this determination. Rather, so long as there is some evidence in the record showing a dispute over Nussbaum's intentions, that is sufficient to deny summary judgment. *Cf. Campbell*, 726 S.E.2d at 225, 227 (finding a directed verdict to be inappropriate because the "evidence conflict[ed] as to whether the ring was conditioned upon marriage" and thus the "ownership of the ring was a jury issue[.]").

463, 476 (2015) ("The no-fault approach in favor of the engagement ring's donor has become the majority rule in U.S. jurisdictions."). Because the South Dakota Supreme Court in *Fanning* followed the majority approach with respect to holding that gifts given in contemplation of marriage generally belong to the gift-giver in the event the marriage does not materialize, the court predicts that the South Dakota Supreme Court would follow the majority approach with respect to the role fault plays in determining who is legally entitled to an engagement ring. *See Fanning*, 535 N.W. 2d at 773-75.[4] Thus, the court will not consider Nussbaum's or McKinney's fault in the dissolution of their engagement when it determines who is entitled to the ring.

McKinney concedes that Nussbaum initially gave McKinney the ring in contemplation of marriage. *See* Docket 20 at 4. But McKinney argues that although the ring began as a gift in contemplation of marriage, it "transformed . . . to an absolute gift after [McKinney] returned the ring to Nussbaum in November of 2020" because "[Nussbaum] returned the ring to [McKinney] without proposing again or believing the parties would marry." *See id.* Thus,

---

[4] McKinney correctly notes that the South Dakota Legislature does not allow for no-fault divorces. *See* Docket 20 at 8; SDCL § 25-4-2 (providing for specific grounds of divorces); *see also Christians v. Christians*, 637 N.W.2d 377, 387 (S.D. 2001) (Konenkamp, J., concurring specially) ("South Dakota is not a pure no-fault divorce state."). But the fact that a state provides only for fault-based divorces does not compel the conclusion that fault must play a role in determining to whom an engagement ring belongs in the event a couple does not marry. *See, e.g., Campbell*, 726 S.E.2d 221, at 226-27 (holding that the "consideration of fault has no place in determining ownership of an engagement ring" despite acknowledging the state legislature's use of fault in determining other areas of the law, including whether divorce is appropriate). Thus, McKinney's observation does not change the court's analysis.

McKinney argues that there is a genuine dispute over whether Nussbaum gave the ring (the second time) as a gift in contemplation of marriage. *See id.* at 4-5.

Viewing the evidence in the light most favorable to McKinney, the court finds that the record contains a genuine dispute over Nussbaum's intentions when he gave McKinney the ring the second time. In November 2020, McKinney removed the ring from her finger and "slammed it down on the end table and said there it is." Docket 19-2 at 14. Nussbaum held onto the ring for two or three months, and then gave it back to McKinney without proposing to McKinney or discussing marriage. *See id.* In May 10, 2021, Nussbaum and McKinney exchanged text messages from which a jury could infer that Nussbaum intended to give McKinney the ring as a gift untethered to the marriage. *See* Docket 23-3 at 2-5. Specifically, on May 10, 2021, Nussbaum sent the following texts to McKinney regarding the ring: "You came back from Florida on 3/16 and [were]n't wearing [yo]ur ring . . . [yo]u don't want to wear it . . . so this relationship ended then[.] Docket 23-3 at 2. Nussbaum continued: "[S]ince then [yo]u go out with [yo]ur group of people to different bars/ country club/ every where . . .  and I would bet my life of [yo]u had [yo]ur ring [yo]u wouldn't [] [w]ear it . . . so let's not kid each other . . . it ended when [yo]u took it off . . . or am I wrong??" Docket 23-3 at 2. Later in the conversation, Nussbaum said, "[Yo]u took the ring off from that day we are not a couple[.]" *Id.* at 3. He reiterated this understanding when he said, "I asked [yo]u to put [yo]ur ring on and [yo]u won't answer why [yo]u won't...?[] [Yo]u took the ring off in Florida and haven't worn it since[.] [Yo]u broke our engagement then[.] [T]his

12

was your choice to end the engagement then . . .  There[fore] there would be no marriage[.]" *See id.* at 4. Later in the conversation, McKinney also asked, "Or you just wanted to know where my ring was[?]" to which Nussbaum replied, "I don't ca[r]e where it is . . . just wanted to know why u don't wear it[.]" *Id.* at 5. McKinney also testified in her deposition that after Nussbaum gave her the ring for a second time, Nussbaum never asked her to return the ring. *See* Docket 19-1 at 13.

Viewing the evidence in the light most favorable to McKinney, the non-moving party, a reasonable jury could read these messages and conclude that Nussbaum intended to give McKinney the ring without regards to marriage because he indicated that he believed McKinney called off the engagement,[5] yet he never asked for the ring back and at one point stated that he did not care where the ring was. *See* Docket 23-3 at 2-5. Furthermore, Nussbaum admitted that although he originally purchased insurance for the ring, he stopped insuring it once he "no longer had possession of it[.]" Docket 19-2 at 18. Viewing Nussbaum's decision to stop carrying insurance on the ring in the light most favorable to McKinney, Nussbaum's decision resulted in him losing a legal avenue to recover for damage to the ring, and thus it suggests Nussbaum

---

[5] This conclusion does not contradict the court's earlier observation that McKinney bound herself in her admission when she stated her engagement with Nussbaum lasted until June 2021. *See supra* p.5 n.1. The inquiry here is whether Nussbaum gave McKinney the ring for the second time in November 2020 in sole contemplation of marriage, which turns in part on whether he subjectively believed the two were still engaged. *See Fanning*, 535 N.W. 2d at 773-75.

intended for McKinney to keep the ring as a gift regardless of whether they married.

The court recognizes that the record also contains evidence that supports Nussbaum's position that he gave McKinney the ring the second time in contemplation of marriage. But even though Nussbaum may possess evidence that he gave McKinney the ring in contemplation of marriage, a party moving for summary judgment is not entitled to a judgment just because the facts he offers may appear to be more plausible or because the adversary may be unlikely to prevail at trial. *See Handeen*, 112 F.3d at 1354. Here, because the record contains factual disputes over Nussbaum's intentions when he gave McKinney the ring the second time and thereafter, the court denies summary judgment on this count.

**B. Breach of Contract Claims**

McKinney alleges three breach of contract claims against Nussbaum in her counterclaim. *See* Docket 3 ¶¶ 39-59. First, she alleges that Nussbaum breached an oral contract to pay McKinney 25% of Nussbaum's business's net earnings. *See id.* ¶ 40. Second, she alleges that Nussbaum breached an oral contract to pay interest on two loans that McKinney made to Nussbaum. *See id.* ¶¶ 47-48. And third, McKinney alleges that Nussbaum breached an oral contract to pay her rent while Nussbaum lived in McKinney's Grand Prairie house. *See id.* ¶ 54; Docket 20 at 14.

To succeed on a claim for breach of contract, a plaintiff must establish: (1) an enforceable promise; (2) a breach of the promise; and (3) resulting

14

damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). Ordinarily, the existence of a valid contract is a question of law. *Werner v. Norwest Bank South Dakota, N.A.*, 499 N.W.2d 138, 141 (S.D. 1993). But if the existence and terms of a contract are in dispute, such issues are questions for the fact finder. *Behrens v. Wedmore*, 698 N.W.2d 555, 566 (S.D. 2005).

A contract can be either express or implied. *See* SDCL § 53-1-3. Express contracts are ones in which the terms are stated in words and can be oral or written. *Id.; see also Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D. 1991). Implied contracts are ones in which the existence and terms are manifested by conduct. *Id.* "An implied-in-fact contract is created when 'the intention as to [the contract] is *not* manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction." *J. Clancy, Inc. v. Khan Comfort, LLC*, 955 N.W.2d 382, 389 (S.D. 2021) (quoting *Weller*, 477 N.W.2d at 841) (emphasis and alteration in original).

"An express contract results when the parties mutually express an intent to be bound by specific terms and conditions." *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 892 (S.D. 2006) (quoting *Werner*, 499 N.W.2d at 141). "An agreement must be sufficiently definite to enable a court to give it an exact meaning." *In re Estate of Eberle*, 505 N.W.2d 767, 770 (S.D. 1993). While "absolute certainty is not required," "reasonable certainty is necessary," such that "[i]f an agreement leaves open essential terms . . . then a contract is not

15

established." *See Weitzel*, 714 N.W.2d at 892 (citations omitted). "There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *See Liebig v. Kirchoff*, 851 N.W.2d 743, 752 (S.D. 2014) (quoting *Vander Heide v. Boke Ranch, Inc.*, 736 N.W.2d 824, 832 (S.D. 2007)).

### 1. Count II: Breach of Oral Contract to Pay Business Net Earnings

Even viewing the facts in the light most favorable to McKinney, McKinney cannot prove there was a meeting of the minds between herself and Nussbaum regarding her Count II breach of contract claim. McKinney testified that she and Nussbaum agreed that Nussbaum would pay to her 25 percent of the net earnings from one of Nussbaum's businesses. *See* Docket 19-1 at 10-11. But McKinney could not remember which one of Nussbaum's businesses from which the 25 percent of net earnings was supposed to be determined. *See id.* at 10. In fact, she testified that the agreement could have been one or two businesses, but she "d[idn't] recall which ones[.]" *Id.* Earlier in the deposition, McKinney knew the names of Nussbaum's three businesses. *See id.* at 9. The name of the business(es) from which McKinney claims Nussbaum owes 25 percent of such business's net earnings is an essential term because presumably, each business has a unique financial status. Knowing which precise business from which McKinney would earn money directly impacts the amount of money to which she would be entitled. This information is central to the deal, and it is information that McKinney cannot establish. This gap in the

16

agreement shows that McKinney cannot prove the terms of the contract were reasonably certain, and thus it is fatal to her breach of contract claim. *See Weitzel*, 714 N.W.2d at 892.

Other parts of this alleged contract are also uncertain, including exactly what McKinney agreed to do in exchange for Nussbaum paying her 25 percent of one (or two) of his business's net earnings. Although McKinney argues Nussbaum "add[ed] [McKinney] as an officer on official business filings with the South Dakota Secretary of State[,]" McKinney admitted during her deposition that she was "not even sure why [Nussbaum] [appointed her as an officer] other than *maybe* that would have justified him paying me." *See* Docket 20 at 13; Docket 19-1 at 10 (emphasis added). She testified that she did not remember a specific start date, end date, nor did she remember "anything specific" about the agreement about her becoming an officer. *See* Docket 19-1 at 10-11. McKinney's failure to recall basic information about her end of the obligation—namely, her alleged agreement to serve as an officer of one of Nussbaum's businesses—also shows that McKinney cannot prove an essential term of the contract.

McKinney points to Nussbaum's conduct to support her breach of contract claim. *See* Docket 20 at 13. She cites Nussbaum's decision to draft by-laws naming McKinney as an officer of one of his businesses. *See id.*; Docket 19-1 at 11. Even assuming the court can consider Nussbaum's actions as

17

opposed to only his and McKinney's express words,[6] an agreement involves action between two people, and McKinney admitted that she "never completed any duties related to being an officer for one of the three businesses." *See* Docket 16 ¶ 35; Docket 21 ¶ 35. In sum, even after viewing both the parties' statements and actions in the light most favorable to McKinney, McKinney cannot prove at least two essential terms—which business was subject to the 25% net earnings payment and what McKinney's obligations were—of the alleged contract she had with Nussbaum.

Similarly, McKinney cannot show that there is a genuine dispute about whether the contract had sufficient consideration. *See* SDCL 53-1-2 (requiring sufficient consideration for a contract to exist); *see also Central Monitoring*

---

[6] Nussbaum observes that "[f]or the first time, [McKinney] argues the oral contracts she is alleging are implied contracts[,]" because "[she] has only ever alleged express oral contracts with [Nussbaum]." Docket 24 at 11. Thus, Nussbaum appears to suggest that because McKinney only alleges breach of express contract—rather than implied contract—she cannot rely on the parties' actions in opposing summary judgment because these actions are only probative in establishing an implied contract. *See id.*; *J. Clancy*, 955 N.W.2d at 389. It is true that in her counterclaim McKinney labeled her breach of contract claim as a breach of express contract. *See* Docket 3 at 7-8. But in her counterclaim, McKinney alleged facts that are relevant to a breach of implied contract. *See id.* at 7 ("Plaintiff and Defendant had a valid and enforceable oral contract wherein *Defendant was made an officer of Plaintiff's business* and Plaintiff in turn agreed to pay 25% of the business's net to Defendant." (emphasis added)). The Seventh Circuit discussed a similar issue regarding the difference between factual allegations and legal theories in a complaint for breach of contract in the context of surviving summary judgment. *See R3 Composites Corp v. G&S Sales Corp.*, 960 F.3d 935, 941-46 (7th Cir. 2020). Because there is no genuine dispute here that Nussbaum and McKinney did not reach an agreement, the court does not need to reach this issue. *See J. Clancy*, 995 N.W.2d at 390 ("[B]oth express and implied-in-fact contracts require mutual assent.").

*Serv., Inc. v. Zakinski*, 553 N.W.2d 513, 516 (S.D. 1996). Under South Dakota law, to constitute consideration, a performance or return promise must be bargained for. *See Meyer v. S.D. Dep't of Soc. Servs.*, 581 N.W.2d 151, 155 (S.D. 1998) (citing 3 Williston on Contracts *Consideration* § 7.2 (4th ed. 1992) ("Nothing can be treated as consideration . . . that is not intended as such by the parties.")); *see also* SDCL 53-6-1 ("Any benefit conferred or agreed to be conferred upon the promiser by any other person to which the promisor is not lawfully entitled . . . is a good consideration for a promise.").

Here, McKinney's statements that she was "not even sure why [Nussbaum] [made her an officer] . . . other than *maybe* that would have justified him paying [her]" shows that McKinney did not agree to do anything for Nussbaum and thus provided no consideration. *See* Docket 19-1 at 10 (emphasis added). McKinney's actions confirm this reality as she admitted to not performing any officer duties for any of Nussbaum's businesses. *See* Docket 16 ¶ 35; Docket 21 ¶ 35. Thus, viewing the facts in the light most favorable to McKinney, McKinney cannot prove that the alleged contract between herself and Nussbaum with respect to 25% of Nussbaum's business net earnings had sufficient consideration.

McKinney cannot establish her breach of contract claim because she is unable to prove two essential elements of an alleged contract or sufficient legal consideration. *See Liebig*, 851 N.W.2d at 752; *Meyer*, 581 N.W.2d at 155. The court grants summary judgment in favor of Nussbaum on Count II.

19

### 2. Count III: Breach of Oral Contract To Pay On Loan

McKinney alleges that Nussbaum breached their contract for Nussbaum to pay interest on the two loans McKinney made to Nussbaum. *See* Docket 3 ¶ 48. An interest rate in an alleged loan agreement is an essential term. *See Werner*, 499 N.W.2d at 141-42. McKinney admitted in her counterclaim that "[Nussbaum] agreed to reimburse [McKinney] with interest at an undisclosed rate." Docket 3 ¶ 18. McKinney points to text messages that purportedly shows Nussbaum and McKinney agreed to 5% as a "good rate" for the loan. *See* Docket 23-3 at 9.

These text messages, which were sent more than a year after McKinney made the two loans, do not show that *McKinney* agreed to this figure. *See id.*; Docket 16 ¶¶ 37-38; Docket 21 ¶¶ 37-38. Instead, Nussbaum simply declared that "5% is a good rate[.]" *See* Docket 23-3 at 9. But McKinney did not agree with this rate. *Id.*

But even if these text messages did show an agreement, McKinney's pleading that "[M]ilt agreed to reimburse [McKinney] with interest at an *undisclosed rate*[,]" is binding on McKinney. *See* Docket 3 ¶ 18 (emphasis added); *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314-15 (8th Cir. 1990) ("[E]ven if the post-pleading evidence conflicts with evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions."); *Scott v. Commissioner*, 117 F.2d 36, 40 (8th Cir. 1941) ("Admissions in the pleadings

. . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended."). Because McKinney admitted that the agreement did not include a loan rate, McKinney and Nussbaum did not enter a valid contract because they failed to agree to an essential term. *See Werner*, 499 N.W.2d at 141-42. The court grants summary judgement in favor of Nussbaum on Count III.

### 3. Count VI: Breach of Oral Contract to Pay Rent

Nussbaum makes several arguments as to why he is entitled to summary judgment on McKinney's claim of breach of contract claim for failure to pay rent. *See* Docket 17 at 13-18. Nussbaum first argues that he and McKinney "did not agree on what Nussbaum's share of the living expenses would be and did not agree on a specific amount." *See id.* at 14. As discussed above, for there to be a valid contract, "[t]here must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *See Liebig*, 851 N.W.2d at 752. "Consent is not mutual unless the parties all agree upon the same thing in the same sense." SDCL § 53-3-3. While the existence of a valid contract is generally a question of law, "[i]f in dispute, however, the existence of a contract are questions for the fact finder." *Behrens*, 698 N.W.2d at 566 (cleaned up); *see also Werner*, 499 N.W.2d at 141; *Cherne Contracting Corp. v. Marathon Petroleum Co.*, 578 F.3d 735, 740 (8th Cir. 2009) ("[A] jury is to decide material questions of fact regarding the existence or terms of an oral or implied contract.").

Here, the record shows a genuine dispute over the terms of the agreement between Nussbaum and McKinney. On one hand, Nussbaum's deposition testimony does not firmly establish whether he had an agreement with McKinney regarding rent. *See* Docket 19-2 at 12. Nussbaum simply testified that he just told McKinney to "pay whatever bills you need paid out there[,]" and "I did not pay half of any rent . . . there were months were I paid all of it. There were months where I paid some of it." *See id.* Similarly, he testified that while "there [were] a lot of bills I paid, but not formally exactly half the rent, no, never happened." *Id.* On the other hand, McKinney testified that Nussbaum promised to pay her $4,000 a month for part of her mortgage payment before she bought the Grand Prairie house. *See* Docket 19-1 at 15. Furthermore, Nussbaum admitted in a text message exchange that he agreed to pay $4,000 a month. *See* Docket 23-3 at 6. Because there is a genuine dispute over the terms of the contract, the jury must decide such issue. *See Behrens*, 698 N.W.2d at 566. Viewing the facts in the light most favorable to McKinney, a jury could find that Nussbaum promised to pay McKinney $4,000 a month in exchange for allowing Nussbaum to live with her at the Grand Prairie home. Thus, the court rejects Nussbaum's first argument.

Next, Nussbaum argues that even if there was an agreement between Nussbaum and McKinney, "[McKinney] waived enforcement of any agreement for [Nussbaum] to pay $4,000 per month in living expenses." *See* Docket 17 at 16. "A waiver of a contractual right occurs 'where one in possession of any contractual right . . . and of full knowledge of the material facts, does or

forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it." *A-G-E Corp. v. State*, 719 N.W.2d 780, 787 (S.D. 2006) (cleaned up) (quoting *Western Cas. & Sur. Co v. Am. Nat. Fire Ins. Co.*, 318 N.W.2d 126, 128 (S.D. 1982)). "To support the defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right." *Northland Cap. Fin. Servs., LLC v. Robinson*, 976 N.W.2d 252, 258 (S.D. 2022) (quoting *Norwest Bank S.D., N.A. v. Venners*, 440 N.W.2d 774, 775 (S.D. 1989)). At the summary judgment stage, any factual disputes over whether a party waived their contractual rights must be resolved in favor of the non-moving party. *See Crutcher v. MultiPlan, Inc.*, 22 F.4th 756, 766-68 (8th Cir. 2022).

Here, Nussbaum contends that McKinney waived her contractual right to receive $4,000 a month because Nussbaum's total contributions towards McKinney totaled less than $4,00 per month. *See* Docket 16 ¶ 23; Docket 21 ¶ 23. Indeed, some evidence shows that even though McKinney had access to Nussbaum's account, she only paid part of the mortgage payment out of Nussbaum's account on five occasions over the course of over three years. *See* Docket 19-2 at 10, 12; Docket 19-1 at 15; Docket 14-2 at 1 (showing first check in January 2018), 8 (mortgage payment), 23 (mortgage payment), 92-93 (April and May rent payment); 68 (mortgage service check); 95 (showing last check in June 2021).

But McKinney testified that Nussbaum never paid her $4,000 a month and that she asked him about his failure to pay. *See* Docket 19-1 at 15. She

testified that Nussbaum said that he did not know why he did not have the money. *Id.* McKinney further testified that she could not pay herself from Nussbaum's account the full $4,000 every month because she "had to keep a certain amount of balance because [of] the bills that were due the next month." *See id.*

Viewing the evidence in the light most favorable to McKinney, there is a genuine dispute over whether McKinney's actions of not paying herself $4,000 from Nussbaum's account for over three years—or not enforcing the contract at an earlier point—constitute a "clear, unequivocal and decisive act or acts showing an intention to relinquish" her existing right to receive Nussbaum's mortgage payments. *Northland*, 976 N.W.2d at 258. A jury could credit McKinney's testimony that she did not enforce the right because she knew Nussbaum did not have sufficient money in his account, and that McKinney's decision not to do so was reasonable under the circumstances.[7] Thus, the

---

[7] Nussbaum cites *Ramesbotham v. Farmers Elevator Co. of Jefferson*, 428 N.W.2d 542, 544 (S.D. 1988) for the proposition that "[w]here time is not of the essence in performance of a contractual obligation, the obligation must be performed within a 'reasonable' time." Docket 17 at 16-17 (citing *Ramesbotham*, 428 N.W.2d at 544). Nussbaum appears to argue that *Ramesbotham* shows that McKinney waited too long to raise her breach of contract claim, arguing that "[McKinney] cannot now claim [Nussbaum] owes her $168,000 in mortgage payments after not requiring him to consistently help with [the] mortgage while he lived there for three years, after writing the checks for bills from his account, and after she received all the benefit from mortgage payments made." *Id.* at 18. But *Ramesbotham* dealt with the time period that an obligor has to perform—in this case, the time Nussbaum had to pay McKinney—rather than McKinney's time to enforce the contract. *See Ramesbotham*, 428 N.W.2d at 544. In fact, *Ramesbotham* explicitly rejected the buyer's argument that it reasonably delayed paying the seller because the seller had not yet demanded payment, reasoning that "the general rule is that

24

court finds that at this stage, summary judgment on the issue of waiver is improper. *See Crutcher*, 22 F.4th at 766-68.

Lastly, Nussbaum argues that "South Dakota's Statute of Frauds renders any agreement related to paying the mortgage unenforceable." *See* Docket 17 at 18. Under South Dakota's Statute of Frauds, "[a]n agreement for sale of real estate or an interest therein, or lease of the same, for a period longer than one year" "[is] not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged[.]" SDCL § 53-8-2. For the Statute of Frauds to apply in this case, however, the lease agreement must have been for a period longer than one year. *See id.*; *see also* SDCL § 43-32-5 ("No agreement for the leasing of real property . . . for a longer period than one year is valid unless the same, or some note or memorandum thereof, be in writing, signed by the lessor[.]").

Here, the parties have not specified, nor can the court ascertain the exact length of term McKinney agreed to allow Nussbaum to live with her in exchange for half of the mortgage payment, or $4,000 a month. Given this ambiguity, South Dakota law presumes that the length of a lease's term is the "length of time [] the parties adopt for the estimation of the rent." *See* SDCL

---

demand is not a prerequisite to performance of a contractual obligation unless demand is required by the terms of the contract or the peculiar nature thereof." *Id.* Although a person's delay in requesting payment may theoretically waive the right to collect payment depending on the circumstances, such a finding is left to the jury where, as here, the record contains a genuine factual dispute as to why there was such a delay. *See Crutcher*, 22 F.4th at 766-68.

§ 43-32-4; *see also Estate of Fountain v. Schroeder*, 637 N.W.2d 27, 29 (S.D. 2001) (interpreting the phrase "hiring of lodgings" to refer to tenancies and leases but finding the facts of the specific case to fall under a hiring of real property—other than lodgings—because "[t]he lot upon which [the buyer] placed her mobile home was bare."). Viewing the facts in the light most favorable to McKinney, McKinney and Nussbaum agreed for Nussbaum to pay McKinney $4,000 a month for rent. *See* Docket 19-1 at 15; Docket 23-3 at 6. Because McKinney and Nussbaum contemplated a monthly rent, South Dakota law presumes the lease agreement to be monthly. *See* SDCL § 43-32-4. Thus, the Statute of Frauds does not apply, because the lease agreement did not surpass one year. *See* SDCL § 53-8-2; *see also* SDCL § 43-32-5. The court rejects Nussbaum's Statute of Frauds argument.

In summary, the record shows a genuine factual dispute over whether Nussbaum and McKinney agreed that Nussbaum would pay $4,000 a month to McKinney in exchange for McKinney allowing Nussbaum to live at her Grand Prairie home, as well as whether McKinney waived her right to enforce any agreement she had with Nussbaum. The court denies summary judgment on McKinney's Count IV breach of contract claim.

### C. Count I of McKinney's Counterclaim: Unjust Enrichment

Under South Dakota law, a party alleging unjust enrichment must show that the other party both received and knew he was receiving a benefit and that it would be "inequitable to allow the enriched party to retain the benefit without paying for it." *Huston v. Martin*, 919 N.W.2d 356, 366 (S.D. 2018).

"When there is a valid and enforceable contract . . . liability for compensation or other resolution of the breach is fixed exclusively by the contract." *Mealy v. Prins*, 934 N.W.2d 891, 903 (S.D. 2019) (quoting *Johnson v. Larson*, 779 N.W.2d 412, 416 (S.D. 2010)). "Absent fraud, bad faith, or similar theories, unjust enrichment claims are generally unavailable when a claimant has a 'full, adequate, and complete' remedy available at law." *Id.* (quoting *Holzworth v. Roth*, 101 N.W.2d 393, 394-60 (1960)).

"Unjust enrichment contemplates an involuntary or nonconsensual transfer, unjustly enriching one party." *Johnson*, 779 N.W.2d at 416. A party who voluntarily gives a benefit to another cannot succeed in an unjust enrichment claim. *See Mack v. Mack*, 613 N.W.2d 64, 69 (S.D. 2000) ("In order to prove [an unjust enrichment claim], there must be some convincing evidence establishing that this was not gratuitous.").

McKinney alleges that Nussbaum has been unjustly enriched for two primary reasons. First, McKinney argues that Nussbaum was unjustly enriched when Nussbaum lived with McKinney without paying McKinney rent. Docket 3 ¶¶ 29-31. Second, McKinney argues Nussbaum was unjustly enriched when McKinney cared for Nussbaum after Nussbaum's stroke because Nussbaum never compensated her for her services. *Id.* ¶¶ 28, 30-31.

Starting with McKinney's first argument, as stated above, the court finds the record to contain factual disputes about whether McKinney and Nussbaum entered into a valid contract with respect to rent in the first place. The court further observes that Nussbaum has submitted evidence that suggests the

circumstances and equities in this case may not justify relief for McKinney with respect to rent. For example, Nussbaum paid for housing for the two of them before they moved into McKinney's Grand Prairie house. *See* Docket 16 ¶¶ 25-26 (recounting Nussbaum's payments of nearly $100,000 for rent and other living expenses while Nussbaum and McKinney lived together in Nussbaum's condominium); Docket 21 ¶¶ 25-26 (disputing only the relevance of such assertions). Nussbaum also helped McKinney obtain a mortgage by guaranteeing her mortgage so she could purchase the Grand Prairie house because although McKinney had significant cash on hand, she did not have a good enough credit rating for such a mortgage. *See* Docket 16 ¶¶ 13, 15; Docket 21 ¶¶ 13, 15. And there is no evidence in the record to suggest that McKinney attempted to evict Nussbaum, suggesting McKinney voluntarily allowed Nussbaum to stay at the house.

But before dismissing this count with respect to rent, the court "desires a fuller development of the circumstances of the case" and thus denies summary judgment on McKinney's unjust enrichment claim with respect to rent. *See* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2731 (4th ed. 2023); *see also McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979). This result is consistent with how other cases in the Eighth Circuit have dealt with similar situations. *See Gelschus v. Hogen*, 47 F.4th 679, 690-91 (8th Cir. 2022) (reversing district court's granting of summary judgment for breach of contract and unjust enrichment claims when plaintiff could prevail on unjust enrichment claim as an alternative to breach of contract claim); *Lundstrom v.*

28

*Homolka*, 2021 WL 4924371, at *8 (D.S.D. October 21, 2021) (denying summary judgment on both breach of contract and unjust enrichment claims because although South Dakota law prohibits dual recovery for breach of contract and unjust enrichment, "[p]laintiff's unjust enrichment theory is an alternative theory of recovery to his breach of contract claim.").

The court now turns to McKinney's second argument for unjust enrichment, namely regarding the services she provided to Nussbaum while Nussbaum recovered from a stroke. Nussbaum argues that "[a]s a matter of law, [Nussbaum] was not unjustly enriched by [McKinney]'s help while he recovered from a stroke because she voluntarily helped [Nussbaum] during his recovery." Docket 17 at 13. Here, the record contains no genuine dispute that McKinney voluntarily provided care for Nussbaum for two-three months. In response to the question of how McKinney ended up supporting Nussbaum, McKinney responded, "I love him. It was just a natural thing that I would take care of this person." *See* Docket 19-1 at 9. She confirmed her intentions in a text exchange with Nussbaum in May 2021. The following is an excerpt from this exchange:

> McKinney: I promise[d] you before you could walk again that I would love you to the end even if you never got out of that chair and I'd give you the best life we were able to have regardless of your long[-]term rehabilitation. . .
>
> Nussbaum: . . . I didn[']t want a nurse or caretaker . . . I can do it . . . [yo]u didn't think I could do it.. I needed that for my mental health . . . I can't or won't be dependent on [yo]u again… thank [yo]u for all the help you gave… I'm forever grateful . . . What happened to me . . . shouldn't happen to anyone… it's miserable . . . go from [] very physically active to unable to walk or stand . . . it's real hard on the head… but that's old shit . . . moved

past that.., and I'm walking standing and I can think . . . all of which I'm so gr[ate]ful[] for . . .

McKinney: Look. I know you are independent[.] And I was never a nurse. I never EVER said I was or used that word. *I did what any loving partner would do..or should do. I cared and loved you back to a place where you are independent.* But you also helped yourself. YOU did the hard work. But I never left your side and always encourage[d] you that you would be ok no matter what and  we would have a wonderful life. I was your ROCK during your darkest days. I loved you 100% completely and unconditionally . . .

Nussbaum: Well I guess I felt [yo]u as more of a caretaker than any partnership.. I'm gr[ate]ful for [yo]ur help and will always be . . .

Docket 23-3 at 1-2 (emphasis added). In these messages, McKinney repeatedly states that she helped Nussbaum during his recovery because she loved him. *See id.* She even said "I did what any loving partner would do . . . or should do. I cared and loved you back to a place where you are independent." *Id.* at 2. McKinney's words both in her deposition and in these text messages show that she voluntarily chose to help Nussbaum.

This situation does not involve one in which the circumstances required McKinney to care for Nussbaum without notice. Nussbaum had a stroke in December 2016 and was not discharged from the hospital until February 2017. *See* Docket 16 ¶¶ 8-9; Docket 21 ¶¶ 8-9. After being discharged from the hospital, Nussbaum returned to live with McKinney (his fiancé at the time) at his condo. *See* Docket 19-1 at 9; Docket 19-2 at 9. For roughly three months, McKinney provided services such as helping him bathe, helping him use the restroom, preparing meals for him, and driving him to therapy appointments. *See* Docket 16 ¶¶ 11-12; Docket 21 ¶¶ 11-12. The record contains no evidence

30

to suggest that McKinney asked Nussbaum for compensation for her services at any point while she took care of him.

McKinney resists this conclusion by pointing to Nussbaum's text message where he said that he "felt [McKinney] as more of a caretaker than any partnership." *See* Docket 20 at 10; Docket 19-3 at 2. According to McKinney, "while the services were rendered by [McKinney], there was not a meeting of the minds that [McKinney] was gratuitously performing these services." *See* Docket 20 at 10. McKinney also points to the allegation that she and Nussbaum had an oral agreement where Nussbaum would pay McKinney $4,000 for rent. *See id.* Additionally, McKinney highlights her testimony that as a result of her "intense care that [she] provided [Nussbaum][,]" her carpal tunnel syndrome "accelerated[.]" *See* Docket 19-1 at 15; Docket 20 at 11. Finally, McKinney notes that Nussbaum did not hire any in-home nurses. Docket 19-2 at 9; Docket 20 at 10. These factors, McKinney argues, show that "it can be presumed that while McKinney was providing nursing and caretaker duties she would expect to be reimbursed for her services." Docket 20 at 11. But even viewing these observations in the light most favorable to McKinney, they do nothing to dispute her unequivocal statements that she cared for Nussbaum because she loved him. *See* Docket 19-1 at 9; Docket 19-3 at 1-2. Nussbaum's perspective of McKinney's role—whether as a caretaker or loving partner—is not relevant to whether McKinney herself voluntarily helped Nussbaum. *See Mack*, 613 N.W.2d at 69 (looking to intent of the person providing the service to

31

determine whether such person gave it voluntarily). The court rejects McKinney's first argument.

Next, McKinney contends that Nussbaum agreed to pay McKinney a monthly rent and this shows McKinney was unwilling to let Nussbaum live with her for free. *See* Docket 20 at 11. But the record does not support this inference. First, this alleged contract claim stems from when Nussbaum moved into McKinney's Grand Prairie home, months after McKinney had provided services to Nussbaum. *See* Docket 16 ¶¶ 11, 13, 16 (showing McKinney stopped providing care for Nussbaum in June or early July 2017 and showing McKinney purchased the Grand Prairie home in the fall 2017); Docket 21 ¶¶ 11, 13, 16 (not disputing timeline). These distinct time periods undermine McKinney's claim that her alleged agreement is probative of her mindset at the time she provided the services. Second, Nussbaum and McKinney reached the alleged rent agreement after McKinney and Nussbaum ended their engagement. *See* Docket 19-3 at 2 (McKinney admitting that she "remained together [with Nussbaum] and continued to sleep together until the day [she] left for Florida on June 25, 2021."). In contrast, McKinney testified that during the entire time that she provided services to Nussbaum, she remained engaged to him. *See* Docket 19-1 at 9. This difference in relationship status significantly undermines McKinney's position. Finally, as discussed above, while McKinney's brief speculates about McKinney's expectations for wanting to be paid for the services she provided Nussbaum, *see* Docket 20 at 11, her testimony and words say otherwise. She stated multiple times that her love for

32

Nussbaum motivated her to care for him, and never once did she ever ask Nussbaum to pay her. *See* Docket 19-1 at 9; Docket 23-3 at 1-2. The court rejects McKinney's argument to the contrary.

McKinney's last two arguments—that she sustained carpal tunnel injuries and that Nussbaum did not hire any in-home nurses—fare no better. The fact that McKinney sustained an injury on her hand is consistent with her voluntarily choosing to provide care for Nussbaum. Thus, her injury does not show a genuine dispute about whether McKinney voluntarily cared for Nussbaum. Similarly, the fact that Nussbaum did not hire in-home nurses does not undermine McKinney's statements that she provided care to Nussbaum because she loved him. *See* Docket 19-1 at 9; Docket 19-3 at 21-2. She even testified that she believed caring for Nussbaum was the "natural" thing to do, further showing that she voluntarily provided services to Nussbaum. *See* Docket 19-1 at 9. The court rejects McKinney's final two arguments.

In short, the court finds that the record contains no material dispute that McKinney provided services to Nussbaum voluntarily because she loved him. Because unjust enrichment requires an involuntary act such that it would be unjust for the beneficiary to not pay the person giving the benefit, and because the court finds McKinney voluntarily provided care to Nussbaum, the court grants summary judgment in favor of Nussbaum on McKinney's unjust enrichment claim with respect to the services McKinney provided Nussbaum

33

while Nussbaum recovered from his stroke. *See Johnson*, 779 N.W.2d at 416; *Mack*, 613 N.W.2d at 69.

For the above reasons, it is ORDERED:

(1) That plaintiff's motion for summary judgment is GRANTED in part and DENIED in part;

(2) That plaintiff's motion for summary judgment on his return of gift in contemplation of marriage claim is DENIED;

(3) That plaintiff's motion for summary judgment on defendant's counterclaim for unjust enrichment is GRANTED with respect to the services McKinney provided to Nussbaum while Nussbaum recovered from his stroke and DENIED with respect to the rent McKinney alleges that Nussbaum owes her during the time Nussbaum lived with McKinney at McKinney's Grand Prairie house;

(4) That plaintiff's motion for summary judgment on defendant's counterclaim for breach of oral contract to pay 25% of business net earnings (Count II) is GRANTED;

(5) That plaintiff's motion for summary judgment on defendant's counterclaim for breach of oral contract to pay interest on the loans McKinney made to Nussbaum (Count III) is GRANTED; and

(6) That plaintiff's motion for summary judgment on defendant's

counterclaim for breach of oral contract to pay rent (Count IV) is

DENIED.

Dated July 17, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE